**Fredrick NEAL, Executor of the Estate of Marilyn Godby–Neal, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, and Fidelity Investments Institutional Services Company, Inc., Defendants.**

No. 3:01CV662MU.

United States District Court, W.D. North Carolina, Charlotte Division.

June 11, 2003.

Annika Marie Goff, Griffin, Smith, Caldwell, Helder & Lee, P.A., Monroe, NC, for plaintiff.

Lee M. Whitman, Wyrick, Robbins, Yates & Ponton, Raleigh, NC, for defendants.

### ORDER

MULLEN, Chief Judge.

THIS MATTER comes before the court upon cross-motions for summary judgment filed on February 28, 2003. Both parties have filed their respective responses and replies, so the matter is ripe for consideration at this time.

### PROCEDURAL HISTORY

Plaintiff, the estate of an ERISA plan beneficiary, brought action seeking declaratory judgment verifying entitlement to monies paid from the plan.[1] Defendants, General Motors and Fidelity Investments (plan administrator and record-keeper, respectively), filed a subsequent answer and counterclaim. Both parties have moved for summary judgment. Plaintiff contends the estate is entitled to retain the monies disbursed from the plan because the deceased participant[2] never executed a change of beneficiary form prior to death. Defendants contend they are entitled to recover the disbursed monies because the assets were incorrectly paid to Plaintiff due to administrative error.

### SUMMARY OF FACTS

General Motors is the administrator of the General Motors Savings–Stock Purchase Plan (GM Plan). Fidelity is the record-keeper for the GM Plan, providing administrative and record-keeping services for the GM Plan and administering the GM Plan.

Fredrick Marshall Neal, Jr. ("Mr. Neal") was an employee of General Motors and a participant in the GM Plan, for which he designated his wife, Marilyn Godby–Neal ("Godby–Neal") as the sole beneficiary; they were later divorced. After their divorce, Mr. Neal designated his son and daughter, Gerald Neal and Tracey Arnold respectively, as the beneficiaries of his General Motors life insurance, which Fidelity's records reflect. However, Fideli-

---

1. Plaintiff is the executor of the estate of Marilyn Godby–Neal, who received the disbursed monies but has since died.

2. Fredrick Marshall Neal, Jr., who was a participant in the General Motors Savings–Stock Purchase Plan is now deceased too. Mr. Neal and Ms. Godby–Neal were married, but divorced prior to Mr. Neal's death.

ty's records do not show a similar change in the beneficiary designated on his GM Plan prior to dying intestate.

Pursuant to the terms of their divorce, Mr. Neal and Godby–Neal signed a Qualified Domestic Relations Order (QDRO), which provided that Godby–Neal (as "Alternate Payee"), would receive 50% of Mr. Neal's total vested account balance in the GM Plan as of January 1, 1999, as well as 50% of the earnings accrued in the GM Plan between January 1, 1999 and the date of segregation. In addition, the QDRO provided: "Except as described above, the Alternate Payee does hereby waive all rights to benefits of the Plan." [3]

Upon Fidelity's receipt of the QDRO, Fidelity failed to remove Godby–Neal's name as sole beneficiary on the GM Plan, which left intact the existing 1992 Beneficiary Form in Fidelity's database.[4] Accordingly, upon Mr. Neal's death, Fidelity declared Godby–Neal the sole beneficiary and established a beneficiary account in Godby–Neal's name and transferred all of the remaining GM Plan assets into that account. Subsequently, Godby–Neal requested and received a complete liquidation and withdrawal of the entire balance from that account. Fidelity later, after determining that Godby–Neal was not the correct beneficiary, contacted Godby–Neal and later her estate, requesting that the incorrectly disbursed assets be returned. Plaintiff maintains that Godby–Neal was entitled to the assets and argues that her estate should retain the monies.

## DISCUSSION

■ Title 29 United States Code section 1132(a)(1)(B) states "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." In the "definitions" section of ERISA, a beneficiary is described as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C.A. § 1002(8). Since Godby–Neal is designated as the beneficiary of the GM Plan, her estate has standing to clarify rights to future benefits under the terms of the plan.

■ Title 29 United States Code section 1132(a)(3) states "[a] civil action may be brought ... by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." In the "definitions" section of ERISA, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the adminis-

---

**3.** Pursuant to the Qualified Domestic Relations Order (QDRO), Ms. Godby–Neal received 50% of Mr. Neal's total vested account balance in the GM Plan as of January 1, 1999, as well as 50% of the earnings accrued in the GM Plan between January 1, 1999 and the date of segregation. Therefore, Ms. Godby–Neal was not entitled to recover any death benefits from the remaining monies in the GM Plan.

**4.** Plaintiff argues preemptively that a partial beneficiary designation form, never sent to Fidelity, was inoperative. Because Defendants have not raised this argument, the Court will not examine it in detail.

tration of such plan." 29 U.S.C.A. § 1002(21)(A). General Motors, as plan administrator, has standing as. a fiduciary to bring an action under ERISA. *Provident Life & Accident Ins. Co. v. Waller*, 906 F.2d 985, 988 (4th Cir.1990); *U.S. Steel Mining Co. v. Dist. 17, United Mine Workers of Am.*, 897 F.2d 149, 152 (4th Cir.1990) (finding that a plan administrator is "clearly a fiduciary"); 29 C.F.R. § 2509.75–8 (plan administrator must, by the very nature of the position, have discretionary authority and fiduciary status). GM Plan documents state that Fidelity, as record-keeper, "shall have discretionary authority to construe, interpret, apply, and administer the Program provisions" in carrying out its delegated responsibilities. Hence, Fidelity has standing as a fiduciary within the meaning of 29 U.S.C.A. § 1132(a)(3) because of its discretionary duties with respect to the GM Plan benefits. *See Coleman v. Nationwide Life Ins.*, 969 F.2d 54, 61 (4th Cir.1992) ("the discretionary authority or responsibility which is pivotal to the statutory definition of fiduciary is allocated by the plan documents themselves.")

Title 28 United States Code section 1331 provides that district courts "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." The Supreme Court concluded that § 1331 jurisdiction supports "claims founded upon federal common law as well as those of a statutory origin." *Illinois v. City of Milwaukee*, 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 (1972).

◼ Congress enacted ERISA to establish "a comprehensive statutory scheme" to govern employee benefit plans. *Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1452 (4th Cir.1992). Congress clearly expressed its intent for ERISA provisions to preempt state common law: "the provi-

sions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to an employee benefit plan." 29 U.S.C.A. § 1144(a). However, cases have arisen where ERISA did not provide any guidance on the issue before the court; in those situations, the court fashioned a "federal common law of rights and obligations under ERISA-regulated plans." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 1557, 95 L.Ed.2d 39 (1987).

◼ Pursuant to ERISA, federal question jurisdiction exists only where "the issue presented . . . is of 'central concern' to the statute." *Provident*, 906 F.2d at 991 (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)) ("it is clear that a suit by state tax authorities under a statute like § 18818 does not 'arise under' ERISA . . . the State's right to enforce its tax levies is not of central concern to the federal statute"). The Fourth Circuit has previously determined that the two legal issues presented in the instant case are of central concern to ERISA and fall within the realm of federal question jurisdiction: (1) whether unjust enrichment principles should fill in the gaps of ERISA; and (2) whether plan administrators should receive the benefit of these principles. *See, Provident*, 906 F.2d at 991.

Summary judgment is appropriate when "there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Both parties agree that the facts of the case are undisputed. It appears to the court that there are no genuine issues as to any material fact and summary judgment is appropriate.

Having determined that federal question jurisdiction exists, the court must decide whether the disputed issue is governed by federal common law. *Singer*, 964 F.2d at 1452. In developing federal common law, the court must ensure that the law "effectuates the policies underlying ERISA." *Phoenix Mutual Life Ins. Co. v. Adams*, 30 F.3d 554, 559 (4th Cir.1994) (quoting *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 647 (7th Cir.1993)). Congress enacted the preemption provisions, seeking "to ensure that plans and plan sponsors would be subject to a uniform body of benefit law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government." *Singer*, 964 F.2d at 1452 (citations omitted). Moreover, Congress also intended to "promote the interests of employees and their beneficiaries in employee benefit plans [and] to protect contractually defined benefits." *Phoenix*, 30 F.3d at 559 (citations omitted). The Fourth Circuit has espoused certain principles that should be considered when determining whether application of federal common law would be appropriate: (1) ERISA statutory provisions may not conflict; (2) employers may not be discouraged from implementing plans governed by ERISA; or (3) explicit terms of an established ERISA benefit plan may not be overridden. *Singer*, 964 F.2d at 1452; *Phoenix*, 30 F.3d at 563. In the instant case, all three of these requirements are met: (1) ERISA does not contain a statutory provision governing this circumstance; (2) employers would be encouraged to continue implementing ERISA-governed plans if there was a remedy for incorrectly paid monies; and (3) the instant ERISA benefit plan does not explicitly provide a remedy for incorrect payment of monies to beneficiaries. Hence, the disputed issue appropriately requires the application of federal common law.

Finally, after the court has determined that federal common law is applicable, the court must still decide whether the specific remedy sought by Defendant of unjust enrichment should be allowed in this instance. *Provident*, 906 F.2d at 992. The Fourth Circuit has previously enumerated three factors that should be considered when determining whether it is appropriate to fashion an unjust enrichment remedy within federal common law: (1) the plan contract; (2) ERISA statutory policies; and (3) state law. *Provident*, 906 F.2d at 993.

*The Plan Contract*

Title 29 United States Code section 1104(a)(1)(D) provides that an ERISA fiduciary must discharge its duties "in accordance with the documents and instruments governing the plan." The term "plan documents" refers to all "formal or legal documents under which a plan is set up or managed." *Faircloth v. Lundy*, 91 F.3d 648, 653 (4th Cir.1996). Since ERISA expressly provides that fiduciaries must follow plan documents, and these documents control the disposition of plan assets, there is no need for this Court to look beyond the plan documents.

The Fourth Circuit has previously held that even though 29 U.S.C.A. § 1144(a)(1)(D) requires that the plan be administered "in accordance with the documents and instruments governing the plan," there are certain circumstances when instruments other than the plan should be consulted in making administrative decisions. *Altobelli v. IBM Corp.*, 77 F.3d 78 (4th Cir.1996) ("giving effect to a waiver contained in a domestic relations order does not burden plan administrators in a manner violative of ERISA"). Since QDRO's are expressly exempted from preemption by ERISA, they have full force

and effect over an ERISA benefit plan. 29 U.S.C.A. § 1056(d)(3)(A).

Pursuant to their divorce, Mr. Neal and Godby–Neal effectuated a QDRO, which provided: "Except as described above, the Alternate Payee [Godby–Neal] does hereby waive all rights to benefits of the Plan."[5] In addition to the ERISA statutory provision, even the GM Plan documents, under article IV, section 15(c) of the plan, require the program record-keeper to "administer distributions under any Qualified Domestic Relations Order." Defendant's QDRO Approval Guidelines effectuate these requirements by voiding any beneficiary designation completed by the participant prior to the issuance of a QDRO, to the extent the "Alternate Payee" is designated as beneficiary:

> In the event that the [QDRO] contains language divesting the Alternate Payee of all right and interest in the Participant's account under the Plan or waiving such right and interest (with the exception of the amount awarded under the Order), Fidelity will interpret this language as voiding any beneficiary designation completed by the Participant prior to the issuance of the Order to the extent that the Alternate Payee is named as beneficiary.[6]

Even though the QDRO Approval Guidelines specifically state that they do not "alter the Plan," they still may govern how the GM Plan may be interpreted. The GM Plan documents do not provide for the exclusivity of their terms or prohibit reliance on other related documents. Rather, they reserve Defendant's right to "amend [or] modify ... the Program in whole or in part, at any time."

Turning to the facts of the instant case, prior to their divorce, Godby–Neal was designated the sole beneficiary of Mr. Neal's GM Plan assets. After their divorce, notwithstanding the express terms of the QDRO and the above guidelines, Fidelity, through administrative error, failed to remove Godby–Neal as the designated beneficiary under the GM Plan. If the QDRO had been processed pursuant to the aforementioned QDRO Approval Guidelines, Godby–Neal's name would have been removed as the sole beneficiary of Mr. Neal's GM Plan. Hence, Mr. Neal's GM Plan would have had no designated beneficiary on file, at which time the GM Plan provides, in relevant part:

> In the event an unmarried Participant does not file a written beneficiary designation, such a Participant shall be deemed to have designated as beneficiary or beneficiaries under the Program the person or persons designated to receive Basic Life Insurance proceeds upon the death of such Participant under the Corporation's Life and Disability Benefits Program for Salaried Employees.[7]

Since Mr. Neal was unmarried at the time of his death, his son and daughter (Gerald Neal and Tracey Arnold, respectively) would have been automatically designated as the beneficiaries of his GM Plan, as they were already designated as the life insurance beneficiaries. Due to the prior administrative error, however, Fidelity failed to distribute Mr. Neal's GM Plan assets according to the GM Plan guidelines. These facts support creation of a federal common law remedy in the instant case because it would "further the contract between the parties [Defendant and Mr.

---

**5.** Qualified Domestic Relations Order § 8

**6.** QDRO Approval Guidelines § 2, sub-section 1

**7.** General Motors Savings–Stock Purchase Plan, Art. IV, § 9(B)

Neal] and effectuate the clear intent" of the QDRO Approval Guidelines. *Provident*, 906 F.2d at 993.

### ERISA Statutory Policies

■ Congressional emphasis on the equitable character of ERISA plans makes an unjust enrichment action an appropriate remedy in circumstances regarding incorrect payment under an employee benefit plan. *Id.* at 993. The Fourth Circuit points to 29 U.S.C.A. § 1103(c)(2)(A) for support of equitable administration of plan funds, as this section indicates a desire to prevent any party from unjustly profiting (even beneficiaries). *Provident*, 906 F.2d at 993. Adopting this position, the Fourth Circuit agreed with the Third Circuit, holding that to reach "a contrary result would 'discourage some employers from operating ERISA qualifying plans,'" which would inhibit ERISA policy objectives. *Id.* at 993 (quoting *Plucinski v. I.A.M. Nat'l Pension Fund*, 875 F.2d 1052, 1058 (3rd Cir.1989)). Hence, the statutory policies supporting ERISA favor finding that Defendant's federal common law unjust enrichment claim arises under ERISA.

### State Law

In *Provident*, 906 F.2d at 993, the Fourth Circuit held that the facts of the case "fit the archetypal unjust enrichment scenario" and hence support the application of a federal common law remedy of unjust enrichment. In that case, a plan administrator brought an action seeking to recover monies advanced to a participant. Under the terms of the plan, the administrator advanced monies to participants who were injured by a third party, but the participants had to sign an agreement to fully repay the plan any advanced payments from the settlement the participants later received. Defendant (participant) received advanced monies, but neglected to sign the agreement, so Defendant contended that she did not have to repay the plan monies even though she received a settlement greater than the monies advanced. In holding for the Plaintiff (plan administrator), the court reasoned that this was the archetypal unjust enrichment scenario; the result was inequitable where the Defendant received "a double recovery despite knowing about the plan's reimbursement provision, and despite the absence of a requirement that [Plaintiff's] payment be made in the first place." *Id.* at 993.

Like *Provident*, the instant case arose from administrative error (Fidelity's failure to process Plaintiff's waiver in the QDRO). This error arose from Defendant's failure to follow its own plan guidelines (just like *Provident*), enabling Plaintiff to receive the disputed assets and also recover doubly under the GM Plan. This enrichment was unjust because Plaintiff waived all future rights to the GM Plan pursuant to the QDRO, and Plaintiff had already collected her share of the GM Plan assets. The facts of the instant case, like those in *Provident*, "fit the archetypal unjust enrichment scenario." *Id.*

■ Having determined that a federal common law claim of unjust enrichment is appropriate under ERISA when the facts at issue accord with the archetypal unjust enrichment scenario, and its application would further the plan contract while continuing to advance ERISA policy objectives, and found all of these elements to be present in the instant case, the court holds that it is appropriate to fill in the interstitial gaps of ERISA by allowing a federal common law remedy of unjust enrichment to lie.

### Federal Common Law of Unjust Enrichment

The Fourth Circuit has previously held that recovery under a theory of unjust

enrichment, pursuant to federal common law, requires the showing of one of three elements: (1) the payee had a reasonable expectation of payment; (2) the payer should reasonably have expected to pay, or (3) society's reasonable expectations of person and property would be defeated by nonpayment. *Id.* at 993–94.

■ In the instant case, all three of the above requirements are satisfied. Pursuant to the first requirement, it is reasonable for Defendant to expect repayment of incorrectly disbursed funds, especially considering Defendant's prompt notice to Plaintiff upon realizing the error. Second, Plaintiff should reasonably have expected to repay the monies, for she waived any rights to the remaining GM Plan assets pursuant to the QDRO. Even if Plaintiff was not immediately aware of the error, Defendant later notified her of the error. Finally, society's reasonable expectations would be defeated if Plaintiff were not required to return the monies, for the interests of society are best served by equitable decisions and by the proper administration of an ERISA benefits plan. Here, Defendant is entitled to recover these incorrectly disbursed monies.

THEREFORE, IT IS HEREBY ORDERED that Defendants' motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment is DENIED.

IT IS FURTHER ORDERED that both parties' motions for attorney's fees are DENIED.

The Clerk is directed to prepare a judgment consistent with this order, entitling Defendant to recover $87,351.27 plus legal interest from April 3, 2001 until payment is received in full.

Defendant is directed to file with the Clerk a bill of costs in conformity with Fed.R.Civ.P. 54(d)(1).